Commonwealth *v.* Goodman, Appellant.

Argued September 24, 1956. Before RHODES, P. J., GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ. (HIRT, J., absent).

*Michael von Moschzisker,* with him *McBride, von Moschzisker & Bradley, Cecil B. Moore,* and *Leslie P. Hill,* for appellant.

*F. Emmett Fitzpatrick,* Assistant District Attorney, with him *Victor H. Blanc,* District Attorney, *Thomas M. Reed* and *Francis A. Biunno,* Assistant District Attorneys, and *James N. Lafferty,* Deputy District Attorney, for appellee.

OPINION BY GUNTHER, J.:

This is an appeal from the conviction and sentence for rape. Appellant, James Goodman was tried and convicted by a jury on charges of common law rape and contributing to the delinquency of a minor, Hattie Kinsey. Motion in arrest of judgment as to the count of contributing to the delinquency of a minor was granted and the defendant was sentenced on the rape charge to undergo imprisonment at the Eastern State Penitentiary for a term of not less than two and a half years, nor more than five years.

The rape allegedly was committed during the early morning hours of June 17, 1955 in Disston Park in the City of Philadelphia upon Hattie Kinsey, then the age of 17 years and ten months, who had graduated from high school the night before and who had left a high school commencement party in the company of the defendant and another couple. Hattie Kinsey testified that she arrived at the commencement party around 10:00 P.M. on June 16, 1955 where she met the defendant for the first time. Someone suggested the purchase of whiskey for the party and she contributed some money for its purchase. She accompanied the defendant and three others in defendant's automobile for the purchase of the whiskey whereupon all returned to the party. She drank some of it straight given to her by someone other than the defendant and she also drank some served to her in a punch. Shortly thereafter, she states, she blacked out and the next thing she remembered was being in the back seat of an automobile with the defendant. An unidentified man was in the front seat with another one of the girls from the party. Miss Kinsey further testified that she became sick in "a park" and vomited and that thereafter she again blacked out. She was taken out of the car and she did not know what was happening until she realized that "an intercourse was taking place." She testified she fought back, screamed and shouted but to no avail. At first, she was standing up but that apparently two men got her down on the ground. Her dress was torn and her panties were off. She states she got a few scratches on her neck, arms and legs. She was assaulted again, but she did not know by whom and then she blacked out again. She remembered being driven home by the defendant but she again relapsed into unconsciousness and she regained her consciousness in

bed the next morning when she got dressed and went to the police station and told the police what had happened. She also testified that the same day she went to the Philadelphia General Hospital where she was examined. At the police station she gave the police a telephone number which had "stuck in her head."

Dr. Elizabeth Deehan, of Municipal Court, testified that she examined Miss Kinsey on June 21, 1955, finding a few small healing scratches on the arm and on one leg. She acknowledged the scratches could have been caused by briars or bushes as well as by human touching. She also found healing tears on the hymen.

Defendant admitted to three acts of intercourse but he defended on the ground that they were with the consent of the prosecutrix. Carol Ann Williams testified that she had seen her friend, Kinsey, sitting on defendant's lap at the party; that when Miss Williams left the party with Charles Wilkinson to take another girl, Judith Berk, home, and when Wilkinson asked to borrow defendant's car for that purpose, the prosecutrix asked if she could go. Defendant, according to the testimony of Miss Williams, informed the prosecutrix that he had no intention of going along but that upon the insistence of the prosecutrix he agreed to go along. The prosecutrix and defendant sat in the back seat. After taking Miss Berk home, the two couples stopped at Disston Park where Wilkinson obtained two blankets from the car and gave one to the defendant. The prosecutrix was talking and laughing. The couples laid down near each other and she could hear defendant and prosecutrix talking with each other. There were no screams and no sound of fighting.

Charles Wilkinson corroborated the details of the testimony of Miss Williams. He further stated that defendant and prosecutrix had been petting in the au-

tomobile at the time they went out earlier for the purchase of whiskey. He testified that the prosecutrix became sick at her stomach while driving to the park, but that after that she seemed all right, laughing and talking. In the park, Wilkinson had heard a conversation in which defendant said "stop" and the prosecutrix had asked if she were wearing defendant out. When leaving to take Miss Williams home, he saw the defendant and prosecutrix in a very obvious position with the legs of the prosecutrix wrapped around defendant. When Wilkinson returned to the park, he blew the horn of the automobile and defendant and prosecutrix came over, still hugging and kissing. They then stopped for sandwiches and coffee on the way to the home of the prosecutrix.

Judith R. Atkins took the stand to confirm that Miss Kinsey had asked to go from the party with defendant.

The defendant took the stand and testified substantially to the events which took place at the party, the purchase of whiskey, the ride to the park and to the two acts of intercourse which took place in the park. He further testified that after taking Wilkinson home, and on the way to the home of the prosecutrix, he had the third act of intercourse. He testified that at no time did the prosecutrix object, scream or fight, and that all the acts were performed with the consent of the prosecutrix.

With these brief facts, we turn to the contention of the defendant. It is contended that the prejudicial remarks and rulings of the trial judge rendered the trial unfair; that the instructions to the jury, particularly with regard to the character testimony, prejudiced the defendant and rendered the trial unfair, and that the instructions as to character evidence were erroneous.

The issue in the trial of the case was very narrow; Did these acts of intercourse take place with the consent of the prosecutrix or were they performed against her will and with force? We believe that in the determination of this issue, the trial court went too far in limiting the cross-examination and the comments made during the course of the trial. The action of the trial court undoubtedly had its effect on the minds and ultimate action of the jury. The trial court, in its zeal to get to the basic facts and its determination that the guilty shall not go unpunished, leaned over to being both judge, prosecutor and jury.

Defense counsel, in the effort to disprove force used, attempted to bring out that the prosecutrix apparently consented to petting previous to the actual acts of intercourse. The comments of the court effectively nullified this effort: "Q. Right. And on the way down to 21st and Oxford and on the way back were you not petting a little bit with James Goodman? A. Which I objected to, because I told him I didn't know him and I had just met him that night and I did not agree to that sort of stuff. Q. You objected to him petting you on the way down and on the way back; is that right? A. Yes, I did. Q. Did you yell? A. What? Q. Did you holler or yell or tell the people in the front to stop the car? A. *No, I didn't.* The Court: There was no occasion to yell at that time, according to her. When he was going to pet with her, she just objected to it, she said. Why should she yell then? She said she yelled or did something when she was being attacked. Naturally, that would be the occasion to yell. Mr. Moore: She said . . . The Court: Well, all she said was: 'I don't know you and I don't like that.' Why should she yell?"

In rape prosecutions, evidence of the prosecutrix should be carefully considered in determining whether she consented, and ordinarily proof of failure to make an outcry, offer resistance and complain tends to show consent. *Commonwealth v. Berklowitz,* 133 Pa. Superior Ct. 190, 2 A. 2d 516; *Commonwealth v. Balles,* 160 Pa. Superior Ct. 148, 50 A. 2d 729. We are of the opinion that events leading up to allegations of rape are important in the final determination whether consent was given or force was used. The effect of this testimony should have been left for the jury to determine whether resistance and complaint should or should not have been made.

The testimony of the prosecutrix disclosed that she made a report of this incident to the police the next day. The date of complaint was an important factor in the case, particularly in view of her statement that on the *same day* she was examined at the Philadelphia General Hospital. Dr. Deehan, however, testified that she examined the prosecutrix on *June 21, 1955,* which was *four days* after the acts of intercourse had taken place. Aside from the testimony of the prosecutrix that she immediately reported the incidents to the police, there is nothing in the record to indicate that this, in fact, was true. And when defense counsel attempted to pinpoint this time, the court, in effect, testified as to the time: "Q. Now, do you remember what time you went to the police? A. I think it was around 12 o'clock *the next morning.* Q. 12 o'clock? A. The next morning. BY THE COURT: Q. Well, that morning? A. That morning. Q. The same morning? A. Yes. Q. That same day? A. Yes. Q. Not the next day? A. No. Q. It was the same day on which this had happened? A. Yes, it was, around 12 o'clock. MR. MOORE: Your Honor, I must object. Your Honor is suggesting the witness's answers.

THE COURT: I am not suggesting anything. The 'next morning' was mentioned and it was obvious that what was meant was the 'same morning.' I had to clarify it. There is no use of your trying to twist and turn that. It was not the next morning. It was the same day."

If the complaint was made on the 17th of June, it became important for the jury to consider how the prosecutrix behaved toward the defendant the following day, when defendant called at her home. Miss Williams testified to an incident in which she had spoken with the prosecutrix in the presence of the defendant. The incident took place on June 18. Miss Williams had gone to the home of the prosecutrix thinking there was to be a party there. As she pulled up at the home, defendant pulled up in the back of her automobile. When she saw the defendant, there was no outcry or denouncement as to his being the assailant. The court, however, effectively barred inquiry into exactly how she did behave and what she might have said about the defendant: "Q. Did you see anyone else there at the house? A. Well, it was Judy and her husband now, and I went there and as we pulled up, James (defendant) pulled up in back of us and he got out of the car and he asked us was she going to have a party and I told him, 'I don't know yet.' So I knocked on the door and Hattie came to the door. I am quite sure it was Hattie. And I said, 'Hattie, are you having a graduation party?' She said, 'No.' I said, 'Why?' She said, 'Because my mother and I had a misunderstanding.' I said, 'What was it about?' She said, 'Oh, it was something. You know.' Q. Was James present there—. MR. SHRAGER: Objected to. THE COURT: Objection sustained. You will have to stop this. I won't permit this perversion of the trial. MR. SHRAGER: I move that this

testimony be stricken out entirely. THE COURT: Strike it out absolutely. MR. MOORE: I wish to object because she said that this occurrence—THE COURT: The defendant may have learned of the party, but there is no testimony that he was at the party: BY THE COURT: Q. Was he at the party with you? A. He drove up there. Q. He drove up there outside? A. Outside. BY MR. MOORE: Q. Was he present at the time that you were talking to Hattie Kinsey on that Saturday? A. Yes, he was. Q. Thank you very much. THE COURT: He was at no party of hers. MR. MOORE: No. but—BY THE COURT: Q. He was at no party of hers, was he? A. She did not have the party. BY MR. MOORE: Q. But he drove up at the time that the party was supposed to take place and you were talking to Hattie? MR. SHRAGER: Objected to as a leading question. BY THE COURT: Q. Can you testify to any conversation between the defendant and Hattie? A. That Saturday? Q. That Saturday. A. No, I can't. Q. You cannot. That is all. BY MR. MOORE: Q. Was he present at the time you were talking to her? THE COURT: I say that is all on that subject. MR. MOORE: Grant me an exception, your Honor? THE COURT: I give you an exception. MR. MOORE: Thank you, sir." Obviously, the witness was still competent to testify as to the conversation between her and the prosecutrix, regardless of her presence at a conversation between the prosecutrix and the defendant. Just how far this conversation actually went, what was said, her feeling toward defendant, the cause of the "misunderstanding" between prosecutrix and her mother were all sealed off by the ruling of the court.

At another point in the trial, defense counsel attempted to disprove the testimony of the prosecutrix to the effect that she blacked out at the party and that the next thing she remembered was being in the car

of the defendant at the park. Judith Atkins testified that the prosecutrix specifically asked to go along when she requested to be taken home. After this important point was made, the court nullified the inference of consent as follows: "Q. Do you recall the night of June 16, 1955? A. Yes. Q. Were you at this party? A. Yes. Q. Did you see Hattie Kinsey and James Goodman there? A. Yes. Q. Do you remember when you left the party? A. Yes. Q. Who left with you? A. Carol and Charles and James and Hattie. Q. How did Hattie happen to come with you? A. She asked to go. Q. Beg pardon? A. She asked to go with us. Q. Thank you very much. Mr. Moore: Your witness, Mr. Shrager. Mr. Shrager: No questions. The Court: That has nothing to do with the case. Mr. Moore: Her presence in the car was at her own request, your Honor. The Court: What has that to do with what is alleged to have happened later? It has nothing to do with it at all."

While it may be true that the request to go along may not have contributed to what took place later on, yet this testimony was vital for two reasons: (1) it tended to disprove the testimony of the prosecutrix to the effect that she did not know what happened after she allegedly blacked out at the party or how she got into the car of the defendant, and (2) the jury could have reasonably inferred that this desire to go was a chain in the preparation for the subsequent acts which followed. Yet the court saw fit to nullify either or both of these inferences with the comments made. In our opinion this was prejudicial.

Probably the most vital point in the defense turned on the question whether the prosecutrix removed her own panties, thereby indicating consent, or whether they were forcibly removed by the defendant. The

trial court refused to permit the defendant to testify as to whether or not the prosecutrix removed her own pants: "Q. Her pants were off? A. They were off. Q. She took them off, or did you take them off? THE COURT: *That is not a proper question, as to who took them off.* MR. MOORE: Thank you, sir. Excuse me, sir. THE COURT: Go ahead with something else. MR. MOORE: Excuse me, your Honor. THE COURT: You will have to stop that. MR. MOORE: Yes, sir. THE COURT: Proceed." We are unable to see why testimony on this vital point was prohibited. If any defense may be interposed to the accusation of rape, this certainly was proper to establish consensual relations. This alone was so prejudicial as to require the granting of a new trial.

While error is urged relating to the charge of the court below on the weight of character testimony, in view of our holding we need not extend the discussion of this point except to point out that evidence of good character is substantial and positive evidence, not a mere make-weight to be considered in a doubtful case. It may of itself create a reasonable doubt to produce an acquittal, and a judge in commenting on it may not destroy the effect of such evidence by minimizing or effectually destroying its importance. *Commonwealth v. Andrews,* 234 Pa. 597, 83 A. 412; *Commonwealth v. English,* 123 Pa. Superior Ct. 161, 186 A. 298.

Reversed and new trial granted.